UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

IN RE EXTRADITION OF AZRA BASIC   )        No. 5:11-MJ-5002-REW
                                   )
                                   )        CERTIFICATION OPINION AND
                                   )                    ORDER

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court finally evaluates[1] the Complaint[2] for extradition filed by the United
States against Azra Basic ("Basic" or "Respondent"), who stands accused of 1992 war
crimes in Bosnia & Herzegovina.  After considering the full record, the voluminous
briefing, the relevant treaty and conventions[3], and the applicable standards, the Court
**CERTIFIES** Basic as subject to extradition under 18 U.S.C. § 3184.  The Secretary of
State will make the ultimate decision on extradition.  However, a lawful basis to extradite
exists, as detailed in this decision.

I.      **Procedural History**

On March 9, 2011, the United States, on behalf of the government of Bosnia &
Herzegovina ("BiH"), filed a verified complaint to extradite Basic, a naturalized United
States citizen, pursuant to 18 U.S.C. § 3184, the Treaty Between the United States and

---

[1] The Court incorporates by reference its prior rulings in the case, including its decision
on Basic's motion to dismiss.  DE #63 (Opinion and Order).

[2] Unless it matters to the analysis, the Court includes the allegations of the Amended
Complaint (DE #51) within the designation of "Complaint."

[3] Treaty Between the United States and Servia for the Mutual Extradition of Fugitives
from Justice, U.S.-Serb., Oct. 25, 1901, 32 Stat. 1890 [hereinafter "Treaty"]; Convention
against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec.
10, 1984, S. Treaty Doc. No. 100-200, 1465 U.N.T.S. 85, 113 [hereinafter "CAT"];
Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug.
12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 [hereinafter "Geneva Convention (IV)"].

1

Servia for the Mutual Extradition of Fugitives from Justice, and the United Nations

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or

Punishment.  DE #1 (Complaint).  The United States Marshals arrested Basic pursuant to

a complaint-based warrant on March 16, 2011.

The Court conducted Basic's initial appearance on March 17, 2011, and appointed

Hon. Patrick F. Nash to represent her pursuant to the Criminal Justice Act.  DE #7

(Minute Entry).  The Court remanded Basic to custody.  *Id.*  On the same date, the United

States filed a Notice of Memorandum in Opposition to Bail, DE #4, a Notice of the Law

of Extradition, DE #5, and a Notice of Croatian Consulate, DE #6.

The Court conducted a status conference on April 1, 2011, and granted

Respondent's request for an extension of time to file substantive motions. DE #14

(Minute Entry).   Basic filed a motion to dismiss on April 29, 2011, DE #18, and

additionally filed a response brief to the United States's Notice of the Law of Extradition,

DE #24.  The United States responded to Basic's motion to dismiss on May 20, 2011, DE

#25, and Basic replied on June 6, 2011, DE #31.  The Court conducted a second status

conference on July 8, 2011, ordered additional briefing,[4] and granted the United States's

motion to file a sur-reply to the motion to dismiss, DE #36.  DE #35 (Minute Entry).

---

[4] Specifically, the Court requested briefing on the following: (1) Does a charge against an unknown, unnamed defendant toll the statute of limitations under United States law?; (2) Does a federal charge lodged under one statute toll the statute of limitations for a charge under a distinct (but substantively like) statute?; (3) By what authority does Bosnia establish, on the current record, the warrant requirement in the treaty?; (4) Can (and how can) the United States legitimately rely on 18 U.S.C. § 2340A, which did not exist at the time of the alleged underlying conduct?; and (5) What intent component, if any, applies to a flight analysis under 18 U.S.C. § 3290?  DE #35 (Minute Entry).   These issues emanated from the motion to dismiss arguments.

The United States filed its post-status conference brief on July 22, 2011, DE #37, and Basic responded on August 5, 2011, DE #42.[5]  The United States moved to amend the Complaint on August 19, 2011.  DE #45 (Motion).  The Court conducted a third status conference on August 22, 2011, and ordered briefing on the motion to amend.  DE #47 (Minute Entry).   Basic ultimately responded and did not object to amendment.  DE #52 (Response).  The Court granted the United States's motion and ordered a redacted copy of the amended complaint filed in the record.  DE ##53 (Order); 51 (Redacted Amended Complaint).

The United States filed a pre-extradition hearing memorandum on November 3, 2011.  DE #62 (Memorandum).  The Court issued an Order and Opinion on November 4, 2011, denying in part and deferring in part Basic's motion to dismiss.[6]  DE #63 (Order and Opinion).  The Court conducted the extensive final extradition hearing on November 7, 2011, and ordered additional briefing on (1) the effect, if any, of the alternative holding of *Grin v. Shine*, 23 S. Ct. 98, 102 (1902), (2) the effect, relative to *Grin*, of 18 U.S.C. § 3196, and (3) the Court's sources for the criminal and procedural codes of BiH and Republika Srpska.  DE #65 (Minute Entry).  Respondent addressed the first two issues in a post-hearing trial brief filed on November 11, 2011.  DE #66 (Trial Brief).  The United States responded on the issue of source authority on November 17, 2011, DE #70, and responded to Basic's post-hearing brief on November 28, 2011, DE #74.

---

[5] The United States also filed supplemental documents in support of the Complaint on August 1, 2011, including further Red Ribbon Certified/Authenticated Documents.  DE ##39-40.

[6] The Court denied Basic's motion to dismiss insofar as she argued (1) lack of a valid treaty and (2) that her status as a United States citizen prevented extradition under the Treaty.  The Court deferred the remaining two issues: (1) timeliness of prosecution – except as to murder – and (2) whether BiH failed to produce a "duly authenticated copy of the warrant of arrest," a Treaty requisite.

On December 9, 2011, the United States sought leave to file a memorandum and supplemental authority regarding the term "civilian." DE #80 (Motion). Basic responded in opposition on December 16, 2011. DE #83 (Response). That motion remains pending. The Court permitted the United States to file a notice of authority, citing *Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011). DE ##85 (Order); 86 (Notice of Citation).

In this ably-lawyered case, the request for certification is ripe for decision.

## II.    Hearing Summary

The Court conducted a plenary final hearing after several preliminary hearings or conferences on procedural and scheduling issues. Both sides had a full and fair chance to offer proof and argument within the relatively limited scope of an extradition hearing. Neither the rules of evidence or of criminal procedure apply in the extradition context. Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3). A detention hearing is *sui generis*. *Snider v. Seung Lee*, 584 F.3d 193, 203 n.2 (4th Cir. 2009) ("Extradition is sui generis, neither civil nor criminal in nature.") (citations omitted). Hearsay is proper. *United States ex rel. Klein v. Mulligan*, 50 F.2d 687, 688 (2d Cir. 1931). The Court evaluates for probable cause, and the responding party may offer "explanatory" evidence but may not contradict probable cause through evidence offered at the hearing. *See, e.g.*, *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *see also Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011) (discussing procedural framework under § 3184).

The United States simply tendered the verified prosecution documents submitted by BiH to the State Department in support of the request for extradition. It did not offer additional proof at the hearing. Those documents, DE ##1–1-15, were available to both

sides and to the Court.[7]  Respondent agreed and the Court finds that the packet (as well as other authenticated tenders in the record) complies with the requirements of 18 U.S.C. § 3190 in terms of appropriate authenticity and thus admissibility.  The pre-hearing brief of the United States detailed its probable cause arguments.  DE #62 (Pre-Hearing Memorandum).

The Court permitted Defendant to retain a requested expert prior to the hearing, DE #57 (Sealed and *Ex Parte* Order), to offer witnesses on the issue of flight,[8] and to make a complete argument.   The Court finds the evidence offered appropriate and admissible.  The flight evidence directly concerns a statute of limitations analysis.  The expert proof offered helpful explanation about the regional history, ethnic associations, and historical animosities in the Balkans.  Basic did not attempt to use that evidence to undercut probable cause but rather to provide overall context for a difficult and troubling record.  For that purpose, the testimony from Professor Mingst was proper and allowable.[9]

---

[7] The Court considers the full, properly authenticated record as reflected in the Court file.

[8] Basic filed her first *ex parte* motion requesting two subpoenas and one subpoena duces tecum on September 28, 2011.  DE #54 (*Ex Parte* Motion).  The Court denied the request without prejudice, finding that it did not comport with 18 U.S.C. § 3191.  DE #56 (Sealed and *Ex Parte* Order).  Although Basic filed a renewed motion in advance of the final hearing, DE #59, the Court did not rule on the motion prior to the hearing.  *See* DE #82 (denying Basic's motion as moot).  Both witnesses nonetheless voluntarily appeared and testified.  Further, the Court permitted Respondent to tender her employment records from Tanbark Health Care Center, DE #65, which she ultimately filed, DE #72.

[9] Basic did not use Professor Mingst to raise, and has not otherwise raised, a political offense argument.  The Treaty bars extradition if "the offense in respect of which his [the subject's] surrender is demanded be of a political character[.]"  Treaty, Art. VI (adding bar if requisition made "to try or punish him for" such an offense).  The Court presumes, based on the testimony, and without otherwise ruling, that Basic may seek to raise a motivational defense before the Secretary of State.

Professor Mingst helpfully articulated geographic and political elements, specific to the region, that inform the case.  She provided a valuable history lesson on Yugoslavia's dissolution and the states that emerged.  Her depiction of the ethnic divisions within and about the area of BiH, and some of the linguistic and other details of the people, fortify the Court's understanding.

The other witnesses—Lucille Loman and Edith Fultz—depicted Basic's lifestyle in the United States.  Without contradiction, these women testified with personal knowledge that Basic lived openly and under her correct personal identifiers for years in this District.  Although each gave limited testimony related to Basic's experiences in BiH, the primary point of the testimony was that Basic has not, in this nation, acted secretively about her name, person, address, employment, and identifiers.

The parties argued about probable cause particulars, which the Court addresses in a separate section below.  Respondent criticized the charge specifics, the state of the record, and the reliability of certain photo identification steps undertaken by BiH.   The Court evaluated all matters argued.

## III.    Jurisdictional and Procedural Findings

As to jurisdictional and other procedural requisites in this extradition case, the Court finds the following:

a) The Court is authorized to conduct the extradition proceeding.  Section 3184 specifically empowers a United States Magistrate Judge to receive a complaint for extradition, issue a warrant, conduct the required hearing, and make appropriate findings.  18 U.S.C. § 3184.  In this District, local criminal rule 5.1 enables the statutory grant, giving magistrate judges in the District authority to "perform all duties in regard to extradition proceedings specified in 18 U.S.C. § 3184[.]"  LCr 5.1.

b) The Court has jurisdiction over Azra Basic.  The United States Marshal executed the federal warrant against Basic in this District.  *See* DE #8

6

(returned warrant).  The statute extends authority to "any person found within his [the judge's] jurisdiction."  § 3184.

c) The treaties named in the Complaint are in full force and effect, meaning the extradition mechanics apply.  *See* 18 U.S.C. § 3181(a) ("The provisions of this chapter relating to the surrender of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government.").  The Court found in its prior order on Basic's motion to dismiss that BiH succeeded to Yugoslavia's position as a party to the Treaty between the United States and Servia.  DE #63 (Opinion and Order) at 3-7.  Further, both the United States and BiH are bound by the CAT.  "The Convention Against Torture has over 140 signatory nations including the United States . . . ."  *Melaj v. Mukasey*, 282 Fed. App'x 354, 359-60 (6th Cir. 2008).   BiH succeeded to the CAT and provided a formal instrument of succession to the UN Secretary-General on September 1, 1993, with "effect from 6 March 1992."  DE #34-1 (Memorandum) at 10 (citing Status of International Covenants on Human Rights, E/CN.4/1994/68 at 5, *available at http://daccess-dds-ny.un.org/doc/UNDOC/GEN/G93/857/04/PDF/G9385704.pdf?OpenElement*).  The CAT, by its terms, operates to incorporate torture as an extraditable offense under the Treaty.  CAT, Art. 8.

d) Basic is the person named as the extradition target in the Complaint.  The Complaint relies, in part, on identifiers provided by BiH in the extradition packet.  Respondent's own proof includes her Certificate of Naturalization, which confirms her identity via name (changed from Azra to Issabel, per Respondent) and date of birth. DE #18-2 (Naturalization Certificate).  Proffer at the hearing included a description of Basic's birth and marriages, which match those relied upon by BiH.  *See* DE #67 (Hearing Trans.) at 13-15.  Employment records tendered post-hearing further cross-confirm that Basic matches the identifiers set forth in the extradition materials.  *See* DE ##72-1 (I-9 Form) at 2; 72-5 (2004 W-4) at 3; 72-7 (application for life insurance) at 2.  Without meaning any comment on the merits, the Azra Basic before the Court is the person named and sought for extradition to BiH in the Complaint.

e) The Complaint charges Basic with a crime or crimes that fall within the scope of the Treaty's extradition ambit.   The Complaint (corrected by the Amended Complaint)[10] cites a request to extradite Basic to face a charge of "war crimes

---

[10] The Amended Complaint reflects the accurate state of the law in BiH.  The original Complaint sought extradition on charges under Article 433 of the Criminal Code of Republika Srpska and Article 173 of the Criminal Code of BiH.  Evolution of the law in that jurisdiction indicates that Article 433 was, for a time, a successor to Article 142 of the Criminal Code of the former Yugoslavia.  Later, Article 142 returned to force (and Article 433 dropped out) based on changes in Republika Srpska substantive law.  The alleged conduct occurred in 1992, and through the many years since, the legal landscape

against civilians" under Article 142 of the criminal code applicable in the Republika Srpska (a BiH subdivision) and Article 173 of the general criminal code of BiH. Those statutes appear variously in the record. *See* DE #39-3 (Supplement).

The war crimes statutes referenced place under the rubric of "war crimes" various specific acts. These include, as pled, the underlying alleged acts of murder and torture by Azra Basic. *See* Article 142, Criminal Code SFRY, *available at* DE #39-3 at 9 ("Whoever in violation of rules of international law . . . orders that civilian population be subject to killings, torture, . . . or who commits one of the foregoing acts.")[11]; Article 173, Criminal Code of Bosnia and Herzegovina, *available at* DE #39-3 at 13 ("Whoever in violation of the rules of international law . . . orders or perpetrates any of the following acts: c) killings, intentional infliction of severe physical or mental pain or suffering upon a person (torture). . . .").

The Treaty does not list "war crimes" per se, but it does expressly direct extradition for "murder." Treaty, Art. II ("Extradition shall be granted for the following crimes and offenses: 1. Murder[.]"). The CAT, which binds both BiH and the United States, inserts "torture" as an extraditable category. Per the CAT, acts of torture (a defined term) **must** be criminal offenses under the laws of each "State Party." CAT, Art. 4, Sec. 1 (emphasis added). All such offenses further "shall be deemed to be included as extraditable offences in any extradition treaty existing between States Parties." *Id.* at Art. 8, Sec. 1. The CAT thus requires criminalization of "torture," and requires that torture be extraditable. The BiH statutes tie the torture scope to the international law range of illegality. The Treaty and CAT combine to establish that the war crimes specified in the Complaint—murder and torture in violation of the code sections alleged—are within the extradition scope of the Treaty. The Court must interpret treaty language liberally, *Factor v. Laubenheimer*, 54 S. Ct. 191, 196 (1933). A treaty that includes "murder" and (via the CAT) "torture" surely, under any reasonable construction, includes as extraditable predicates war crimes premised on the same specific categories of criminal allegations.[12]  *See also In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 989 (D. Or. 2011) ("When determining whether crimes not included in a list

---

has changed. The Court accepts the BiH descriptions of this history. *See* DE #39-3 (supplement from RS prosecutor explaining statutory evolution).

[11] This Code applies substantively to the Republika Srpksa, per the verified description provided from BiH authorities. Nothing in the record contradicts that internal description from the requesting state.

[12] Basic may contend that the CAT's torture definition does not align perfectly with the Article 142 or 173 meaning. This remains to be seen. The fact that each criminalizes torture when illegal "under international law" strongly suggests that customary international law, including the CAT, is to inform the statutory definition. Such, however, is a matter of BiH law.

treaty by name are nonetheless extraditable, courts have followed the well-established rule that treaties are to be construed liberally to favor the obligation to surrender fugitives.") (citation omitted).

IV.    **Probable Cause**

Section 3184 tasks the Court with assessing the "evidence of criminality" supporting an extradition complaint. 18 U.S.C. § 3184. Specifically, and per the statute, the Court must determine whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention." *Id.* The Treaty, in turn, frames the extradition question as requiring "such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been committed there." Treaty, Art. I. The standard under United States law is, of course, the familiar one of probable cause.

In extradition proceedings, "'evidence sufficient to sustain the charge' is determined on the basis of probable cause." *In re Extradition of Atuar*, 300 F. Supp. 2d 418, 426 (S.D. W. Va. 2003) (quoting 18 U.S.C. § 3184). That standard "is identical to the probable cause standard applicable in preliminary hearings in federal criminal proceedings." *Id.* (citations omitted). Thus, the Court queries whether, on the record, there is a reasonable basis on which to believe that Basic committed the crimes charged. *See In re Extradition of Robinson*, No. 3:11-MJ-7047, 2011 WL 6072102, at * 3 (N.D. Ohio Oct. 21, 2011) (framing question as whether "there is probable cause to believe that the crime charged . . . was committed and that the respondent committed the crime"). A finding sufficient to extradite "merely requires evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the

9

accused's guilt." *Lo Duca v. United States*, 1995 WL 428636, No. CV-95-713, at *12 (E.D.N.Y. July 7, 1995) (quotation and internal quotation marks omitted).

    1.  <u>The Court evaluates only the subject matter of the Complaint.</u>

The Court, as a matter of proper review scope, limits its inquiry to the charges **specified** in the extradition complaint. While the extradition packet, containing some 22 witness statements, includes reference to numerous putative acts by Basic, the Complaint targets only 4 denominated victims. Indeed, referencing the summarized proof, the Complaint states: "*Only the extraditable crimes* of murder and torture, as defined by Article 1 of the Torture Convention, *that Basic is suspected to have committed have been summarized*." DE #45-2 (Amended Complaint) at ¶ 13 (emphasis added). The Complaint specifies and summarizes events **only** as to Blagoje Djuras, Sreten Jovanovic, Mile Kuzmanovic, and Cedo Maric. *See id.* ¶¶ 14-18.

The United States argues that the Court is assessing probable cause as to the unitary charge of "war crimes" and can consult the full record for any qualifying crimes.[13] However, the extradition statute clearly limits the inquiry to the charge in the extradition complaint. The initial warrant, by statute, results from a "complaint made under oath, charging any person found within his jurisdiction, with having committed . . . any of the crimes provided for by such treaty." 18 U.S.C. § 3184. The certification question looks for evidence "sufficient to sustain **the charge** under the provisions of the proper treaty or convention." *Id.* (emphasis added). Here, the charges in the Complaint, reflecting the crimes "provided for by such treaty" are the murder of Djuras and the

---

[13] Although, at the hearing, the United States said the Court "need only look" at the particular victims. DE #67 (Hearing Trans.) at 9. The Government also tried to tie probable cause to the charge made by BiH, *i.e.*, the 1993 Criminal Charge, *id.* at 9, but that is not the formulation within § 3184.

torture of Jovanovic, Kuzmanovic, and Maric. The Court will assess sufficiency of evidence *only* as to those charges. Extending the complaint charge to each individual person mentioned in the lengthy packet would not comply with the statute or provide fair notice to Basic about the subject matter of the extradition inquiry. The United States theoretically could have pursued each alleged war crime instance but instead set forth its summary of the specified "extraditable crimes of murder and torture." That confines the analysis.

2.   <u>Analysis</u>

*Interplay of Relevant Law*

If the extraditable charges for evaluation are those named under the Treaty and, if the Complaint addresses (and Treaty encompasses) murder and torture, then those are the crimes for which probable cause must exist. The exact source for the elements of those charges is somewhat elusive, but definitional consistency exists in all relevant sources.

The BiH statutes simply list "killing" and "torture" in violation of "rules of international law" as predicate war crimes.

> Whoever in violation of rules of international law effective at the time of war, armed conflict or occupation, orders that civilian population be subject to killings, torture, . . . or who commits one of the foregoing acts . . . .

BiH Criminal Code, Art. 142.

> (1) Whoever in violation of rules of international law in time of war, armed conflict or occupation, orders or perpetrates any of the following acts: . . . c) killings, intentional infliction of severe physical or mental pain or suffering upon a person (torture) . . . .

BiH Criminal Code, Art. 173.

11

The CAT particularly defines torture and is an applicable rule of international law. Per that convention, torture is

> severe pain or suffering . . . intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person committed . . . or intimidating or coercing him or a third person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT Part I, Art. 1. Other applicable international law sources would include the 1949 Geneva Convention (IV)[14], which specifically addresses acts prohibited against civilians. That term extends protection to "persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by . . . detention . . . or any other cause[.]" 1949 Geneva Convention (IV) Part I, Art. 3(1). That convention prohibits "violence to the life and person, in particular murder of all kinds, mutilation, cruel treatment and torture." *Id.*

---

[14] Yugoslavia was a signatory to the Geneva Convention. BiH succeeded to the convention under principles of succession and by formal adoption. *See* IRC, www.icrc.org (click on "The Geneva Conventions of 1949 and their Additional Protocols"; then follow "Read full overview" hyperlink; then follow "States Party to the Geneva Convention" hyperlink under "Where do the Geneva Conventions apply?") (last visited July 26, 2012) (listing "State Parties" to Geneva Conventions and identifying ratification/accession on 12.31.1992); *Al-Quraishi v. Nakhal*, 728 F. Supp. 2d 702, 744 (D. Md. 2010), *reversed on other grounds by Al-Quraishi v. L-3 Servs., Inc.*, 657 F.3d 201 (4th Cir. 2011) ("[T]he Geneva Conventions represents a universal, international consensus with respect to what constitute war crimes."); *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 764 (9th Cir. 2011) (noting that Geneva Conventions "generally reflect customary international law" (citation and internal quotation marks omitted)); Jordan J. Paust, *Applicability of International Criminal Laws to Events in the Former Yugoslavia*, 9 Am. U.J. Int'l L. & Pol'y 499, 500 (1994) ("[U]nder generally accepted principles of international law, the new states or entities which emerge from the former Yugoslavia, as well as the participants in these processes, remain bound to observe Yugoslavia's multilateral treaty commitments."). In any event, customary international law treats certain restrictions, like prohibitions on torture, as peremptory international norms. *See id.* at 504 ("Customary international law binds all nations." (footnote omitted)).

United States law, of course, also criminalizes murder and torture.  Under 18 U.S.C. § 1111(a), "Murder is the unlawful killing of a human being with malice aforethought." *See also Black's Law Dictionary* 1043 (8th Ed. 2004) (defining murder: "The killing of a human being with malice aforethought."); *id.* at 977 (defining malice aforethought:  "encompassing . . . (1) the intent to kill, (2) the intent to inflict grievous bodily harm").  The federal torture statute, which implements the CAT, largely mirrors the CAT definition, *see* 18 U.S.C. § 2340.  *See also Black's supra* at 1528 (defining torture:  "The infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure.").  That statute post-dates the events here, but certainly the federal assault statute, where applicable, also would make illegal an intentional physical assault involving a dangerous weapon or resulting in "serious bodily injury," a term that includes permanent disfigurement.  *See* 18 U.S.C. § 113 (including cross-referenced definitions).

Under any applicable definition, there is probable cause to believe that Basic intentionally killed Blagoje Djuras.  There is also probable cause to believe that Basic tortured Mile Kuzmanovic and Cedo Maric.  The evidence submitted by BiH through the United States, properly authenticated under 18 U.S.C. § 3190, creates a reasonable basis to believe that the acts occurred and that Basic committed said acts.

The authenticated BiH witness statements consistently describe events from April 26, 1992, in the Cardak settlement of Derventa.  As unrest in the area related to the fracture of the former Yugoslavia grew, ethnic friction intensified between local Serbs, Croats, and Muslims.  The Cardak settlement was primarily Serbian.  Armed Croat and Muslim groups in the area began making threats toward the Serb population.  This led to

13

the creation of some type of local guard or defensive units of unspecified organization. DE #1-5 (Statement of Dragan Kovacevic) at 68 (describing Serb guards as "poor and disorganized"); *id.* at 84 (Statement of Radojica Garic) ("The settlement was Serbian since the majority of the population were Serbs. Not long before the war started, Croats and Muslims started forming military units of HVO (*Croatian Council of Defence*) and HOS (*Croatian Armed Forces*) and Green Berets. They supplied arms and started threatening the population of Serbian nationality that they would all be driven away and that they would all be killed.").

On April 26, 1992, Croat groups, with the assistance of Croatian military units, entered Cardak and took dozens of local Serbs hostage. Many were taken to a former Yugoslavian National Army (YNA) Centre. Although the events of that day and those after did not occur in isolation, the Easter round-up and occurrences involving the specified victims, as supported by a valid record, require a certification that Basic is extraditable.

### The murder of Blagoje Djuras

There is probable cause to believe that Azra Basic murdered Blagoje Djuras.

The Court proceeds (as it must) on the authenticated BiH documents and the evidence of record. The BiH documents include an autopsy report and DNA evidence related to the exhumation of Djuras from a shallow road-side grave. DE #1-5 (Medical and Autopsy Submissions) at 28-33. That report depicts discovery of the grave (from June 2003), the removal of the body, and ultimate DNA identification as Blagoje Djuras. The autopsy reveals "all ribs on the left side . . . totally broken." DE #1-5 (Autopsy Minutes) at 26.

14

Multiple witnesses describe the death of Djuras.  The statements consistently depict Djuras as a local Serb detained on or about April 26, 1992, and held at the YNA Centre.  The witnesses invariably depict Djuras as murdered in captivity by or with the involvement of a uniformed Croatian female soldier named Azra.  The Court focuses on a few critical parts of the record.

Radojica Garic gave a statement in 1992 under penalty of perjury.   Garic described the April 26, 1992, assault on Cardak that involved "help of the Croatian Army, a unit from Rijeka, I think it was the 108th Rijeka Brigade."  DE #1-5 (Statement of Garic) at 84.  "They arrested all the found Serbs, and set fire to their houses."  *Id.*

Garic described a horrific scene of mass captive beating at the YNA Centre.  Garic himself allegedly endured abuse and torture from various Croat soldiers.  He reports:  "Almost all arrested Serbs from Cardak were beaten unconscious, and the room in which we were was all bloody, because the blood ran from the wounds they made with their beatings."  *Id.*  As to Djuras, Garic testified:

> Beside me, there was Blagoje Djuras and they beat him horrendously with legs and arms in the area of his stomach.  While they were hitting him Blagoje was falling down, but they forced me to get him up and I did.  When Blagoje was unconscious, one woman wearing a uniform of a Croatian soldier approached and stabbed him with a knife in the area of his neck, after which he moaned and ended his life.  After that Azra took us by the hair and dragged us to the wound on the neck . . . and made us drink that blood.

*Id.*  Garic was an eyewitness and attributed the death to a female Croatian soldier named Azra who beat and then murdered the victim.

Dragan Kovacevic also was present.  He gave a 1994 statement under penalty of perjury, reporting that he, too, was arrested during the Cardak assault and taken to the YNA Centre on April 26, 1992.  Kovacevic echoed the described beatings and torture

inflicted on the prisoners by the Croatian soldiers (whom he identified as from the 106th

Rijeka Brigade).  DE #1-5 (Statement of Kovacevic) at 68.  Kovacevic noted that

"[a]mong those soldiers there was an Azra, a woman wearing a uniform of Croat soldiers

and she was the first one who started hitting the arrested Serbs."  *Id.*  As to Djuras,

Kovacevic recalled:

> The beating and harassment lasted two nights and three days in the YNA
> Centre . . . .  While we were in the YNA Centre, Croat policemen and
> soldiers beat up Blagoje Djuras, from the settlement Cardak, and after that
> Azra approached and slit his throat.  Blagoje was kept in that room for two
> days, and after, his body was taken away, but I do not know where.

*Id.*

Other statements further and corroboratively depict the killing of Djuras.  *See* DE

#1-5 (Statement of Mile Kuzmanovic) at 73 ("Due to their blows he passed out and then

someone from the group slit Blagoje's throat.  I did not see if that was Azra or someone

else . . . but the three of them were beside Blagoje."); *id.* at 92 (Statement of Zdravko

Vidovic) ("I saw that some Azra from Rijeka approached to him while he was

unconscious, having a knife in her hand, she kneeled next to him and said: 'Look how

Arkan woman kills!' . . . I claim that Azra did it."); *id.* at 98 (Statement of Zeljko Stajcic)

("I saw that Djuras was lying on the floor. . . a woman in camouflage uniform with HOS

mark who was called Azra, came among us, and I saw that she had a knife. . . the knife in

her hand went toward Djuras . . . and hit him several times in the region of neck."); *id.* at

63 (Statement of Momir Lazic) (describing Azra, a woman from Rijeka:  "When she hit

me I fell unconscious, and when I regained consciousness I saw Blagoje Djuras . . .lying

with his throat slit, with blood around his body.  The present Serbs from Cardak said to

me that Azra had slaughtered him.").

Certainly, there is a factual question over whether the Azra described by the witnesses is the Azra Basic before the Court.  However, reasonable evidence supports the BiH assertion that Respondent is the person at issue.  Kovacevic, an eyewitness to the murder, participated in an identification process conducted by BiH to solidify evidence of identity in this matter.  He, along with five other witnesses, picked Azra Basic from a photographic line-up of suspects, positively identifying her as the "Azra" from the YNA Centre in Derventa in 1992.  *See* DE #1-6 (supplemental materials setting forth line-up process, documents, and result).   Kovacevic reported (in 1994) that Luka Patkovic was in the group with him, along with Mile Kuzmanovic, at the YNA Centre.

Patkovic also identified Basic during this photographic line-up process.  DE #13-14.  Patkovic was a victim in the Cardak round-up, and he gave a corroborative statement as to the torture of the group.  He summarized that Djuras had been "first beaten up, and then approached by a Croatian soldier and slaughtered with a knife."  DE #1-5 (Statement of Luka Patkovic) at 79-80.

Again, Kuzmanovic also directly associated Azra with the April 26 torture and with the Djuras killing.  Each of these three men visually identified Azra Basic, the person now before the Court, as the "Azra" central to their ordeal and the Djuras execution.

The Court acknowledges Basic's criticisms of the line-up evidence.  As Basic notes, the passage of time (from 1992 events to a 2009 identification), the linguistic similarity of participating witness descriptions, and the process used may impact the relative weight of the evidence or support suggestiveness theories.  That authorities conducted the line-up installments close in time or recorded similar witness narratives is,

17

at most, an area for defensive investigation.  Those elements do not eliminate the fact that the record discloses six persons that independently picked Azra Basic from the array of photos.   The narratives are similar, but not identical, and the Court sees no basis to reject the proof outright.  Further, the extensive cross-corroboration from the witnesses' statements given in the early 1990's undercuts the suggestiveness critique.   The Court considers the photo identification as part of the totality of proof, taking into account the specifics of identification in assigning relative weight to the evidence.  *See, e.g.*, *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 890-91 (N.D. Ill. 2006) (discussing "evidentiary value" as affected by suggestiveness); *In re Extradition of Chavez*, 408 F. Supp. 2d 908, 914 (N.D. Cal. 2005) (discussing *Nell* suggestiveness factors—including time-gap, witness opportunity, certainty of identification—and noting no per se rule regarding identification procedures and competency for probable cause).   Each identifying witness surely experienced an impactful and permanently altering event during the lengthy encounter with "Azra."  The identification evidence is, in the probable cause context, highly convincing.[15]

_____

[15] Per Basic, the array was unduly suggestive because (1) she was the only non-Serbian in the array; (2) the positioning of the photographs never changed; and (3) 4 of the 6 witnesses viewed the photographs one after the other, "passing each other going in and out of these rooms" and, further, all stayed at the same hotel and all were from Derventa. DE #67 (Transcript) at 92.  Photo arrays more suggestive have been upheld in the probable cause context.  *In re Extradition of Chavez*, 408 F. Supp. 2d at 914  (noting concern about the identification procedure (1 photo) and finding the identification alone insufficient to establish probable cause but ultimately considering the identification in probable cause assessment); *see also In re Rodriguez Ortiz*, 444 F. Supp. 2d at 890 (stating, in the extradition context: "Clearly, highlighting the accused's photo in color while the other photos were black and white diminishes some of the evidentiary value that can be extrapolated from such a process.  However, as Ortiz acknowledged in his argument, the Court can still consider the two identifications . . . .").

Here, the process was, perhaps, imperfect, but the Court cannot say that the photo array was "unduly suggestive."  *Phillips v. Allen*, 743 F. Supp. 2d 931, 941 (N.D. Ill.

The Court finds a reasonable basis to believe that Basic intentionally killed Djuras on or about April 26, 1992, at the YNA Centre in Derventa.   All witnesses associate the execution of Djuras with a Croat female soldier named Azra.  Six witnesses to the relevant April events identified Basic (by photo) as the female "Azra" involved in the Cardak raid.  Three of these witnesses said Azra executed Djuras.  The United States presents adequate proof, via the BiH proffered documents, to establish probable cause.

*The torture of Sreten Jovanovic, Mile Kuzmanovic, and Cedo Maric*

There is probable cause to believe that Azra Basic tortured Mile Kuzmanovic and Cedo Maric.  There is not probable cause to believe that Azra Basic tortured Sreten Jovanovic.

1. Jovanovic

The claim as to torture of Jovanovic rests only on the victim's unsworn statement and medical documentation.  Undoubtedly, there is probable cause to believe Jovanovic

---

2010) (citation omitted).  Basic was one of six women in the photo array, and differences in physical characteristics do not necessarily require suppression. *Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 336 (W.D.N.Y. 2011) (citation omitted) (collecting cases regarding hair styles).  Each witness positively identified Basic based on one array.  *See* DE #1-6 at 8 (identification by Radoslav Stojakovic); *id.* at 10 (identification by Cedo Prodic); *id.* at 13 (identification by Luka Patkovic); *id.* at 16 (identification by Mile Kuzmanovic); *id.* at 19 (identification by Nedo Blagojevic); *id.* at 22 (identification by Dragan Kovacevic).  Further, the Court's review of the photo lineup and identification procedure does not indicate that "'a very substantial likelihood of irreparable misidentification' existed."  *Phillips*, 743 F. Supp. 2d at 942 (quoting *Neil v. Biggers*, 93 S. Ct. 375 (1972)).  The Court also notes that each identification process took 20-25 minutes over the course of a morning, and officials oversaw and nominally verified the results as stated, including witness descriptions and narratives.  Basic's image does not "leap out at the witness due to its prominence, size, or clarity," and Respondent has not shown that the witnesses were "somehow encouraged to select [her photograph]." *Celestin v. City of New York*, 581 F. Supp. 2d 120, 431 (E.D.N.Y. 2008) (citation omitted).  Basic's criticisms are speculative.  Nothing shows a likelihood of collusion or an engineered result.

endured torture on April 26 and later, in the area of Derventa.  He, like so many Serbs, was allegedly captured, questioned, and beaten.  DE #1-5 (Statement of Sreten Jovanovic) at 60-61.  The medical proof confirms indicia of fractures, burns, and other scarring wholly consistent with Jovanovic's narrative.  DE #1-5 (Medical Report) at 54-55.

However, the information presented regarding Jovanovic's identification of Basic falls below the probable cause threshold.  He does claim to have been arrested by "a certain Azra with a group of military policemen of Rijeka brigade."  DE #1-5 (Statement of Jovanovic) at 60.  The statement does not provide Azra's gender or any other specific information as to that person.  Further, Jovanovic was not taken to the YNA Centre on the date in question, the site central to all other relevant witness testimony.  His captors allegedly took him to an elementary school.  Jovanovic did not photo-identify Basic, and no other witnesses place Basic at the site of Jovanovic's alleged torture or corroborate the presence of a female Azra, much less that the perpetrator was Basic.  The Court thus cannot find probable cause related to Jovanovic.

2.  <u>Kuzmanovic and Maric</u>

The analysis as to Kuzmanovic and Maric differs sharply from that of Jovanovic—for each, there is probable cause, on this record, to believe Basic subjected them to torture.

Kuzmanovic provides a 1994 statement directly accusing Croatian soldier "Azra" of torture.  After arrest, and at the YNA Centre, she was in a group that allegedly ordered victim ingestion of salt, ordered ingestion of Yugoslavian money, and "started hitting us mercilessly[.]"  DE #1-5 (Statement of Kuzmanovic) at 72.  Later, Azra and others "made

20

us lick the blood on the floor," which pooled after soldiers allegedly yanked prisoners' teeth out with knotted rope.  *Id.*

Relative to Kuzmanovic, and per his statement, Azra "herself made a cut on my left auricle with some kind of pliers or scissors for cutting fruit trees, and that injury can be seen today."  *Id.* at 73.  Witness Patkovic, also imprisoned and present at the YNA Centre, gave his own statement under penalty of perjury.  In that, he observed (referencing "a rather short woman wearing a uniform of a Croatian soldier, and she was called Azra"):  "That woman cut Mile Kuzmanovic's ear with pliers, I think his left ear[.]".  *Id.* (Statement of Patkovic) at 79.

As noted in the Djuras analysis, both Kuzmanovic and Patkovic identified Basic during a later photographic line-up.  Thus, each not only gave direct information concerning torture, each also pointed to Azra Basic as the actual alleged perpetrator.  *See* DE ##1-6 at 14 (identification by Patkovic); 1-6 at 16 (Statement of Kuzmanovic).

On this record, the Court finds a sufficient basis to believe that Basic herself engaged in torture of Kuzmanovic.  The context is a formal action by alleged Croatian military that included the arrest and detention of persons based on ethnicity.  Basic allegedly, and in her military role, initiated beatings, inflicted serious physical and emotional injury, and permanently disfigured Kuzmanovic's person with pruning shears.  Under any definition, and on this record, this is probable cause supporting a charge of torture.

As to Maric, he individually reports inclusion in the Serb round-up of April 26.  His captors took him to the YNA Centre.  He states:  "I would like to especially emphasize a female person in the ZNG uniform named Azra.  She cut the cross and four

"S" letters on my forehead and she hacked me on my neck below the Adam's apple."  DE
#1-5 (Statement of Maric) at 114.[16]

Momir Lazic, in a statement under penalty of perjury, claims he too was at the
YNA Centre as a victim.  He reports a "woman, who was wearing a HOS uniform"
known as "Azra."  *Id.* (Statement of Lazic) at 63. Azra "came into the room and she used
the tip of a knife to carve a cross on the foreheads or backs of some of the prisoners."  *Id.*
Witness Patkovic also reported that Azra "carved a cross on [a victim's] forehead and
four letters S.  She did that with the tip of a knife she was carrying."  *Id.* (Statement of
Patkovic) at 79.  Patkovic related this to victim Kuzmanovic; this may have been a
misidentification of the particular victim, because Kuzmanovic himself did not claim that
specific injury.  Patkovic did, however, photo-identify Azra Basic as the perpetrator.

The weight of evidence places Basic, identified as Azra, at the YNA Centre on
the fateful day.  Maric personally accuses the assailant Azra of permanently and
intentionally disfiguring him, and multiple witnesses confirm that Azra engaged
generally in the particular type of conduct alleged, *i.e.,* carving symbols or letters into
victims.  He did not photo-identify Basic, but the number of witnesses that did easily
establishes reasonable cause to support that Azra Basic was the Azra on the scene and
was the person intentionally torturing victims by permanent disfigurement.

---

[16] The Court rejects consideration of Basic's tendered photo of a Cedo Maric showing no
scars.  No basis exists to believe that the internet picture is that of the alleged victim, and
no proper authentication of the photo appears in the record.  *See* DE #67 (Hearing Trans.)
at 84 (discussing photo, which relates to events in Kosovo, not BiH); *see also* Photo
(tendered at hearing as defense Exhibit 6).

*Leadership and Role*

The Court also notes significant indications that Azra had leadership and an official role relative to the Croatian soldiers.[17]  Multiple witnesses characterize her as giving orders or initiating actions with respect to the prisoners.  *See* DE #1-5 (Statement of Kovacevic) at 68 ("she was the first one who started hitting the arrested Serbs"); *id.* (Statement of Slobodan Jovic) at 87 ("During that period, while they were beating us, Azra was the leading person . . . ."); *id.* (Statement of Stanimir Pijetlovic) at 89 ("I want to point out a female person in uniform, a ZNG member named Azra who, in my opinion, was giving orders to the others to beat us, maltreat and kill, since most probably she was a commander."); *id.* at 91 ("once Azra gave an order to some soldiers"); *id.* ("upon the order of Azra*"); id.* (Statement of Tripo Nincic) at 109 ("On the basis of that event, *i.e.*, when Azya was coming, the same group of soldiers was with her that beat and tortured us, and my personal opinion, from the mentioned facts I saw, is that she was their supervisor and that they obeyed her orders."); *id.* (Statement of Boro Markovic) at 95 (identifying "Azra's Command").  To the extent the torture definition, via international law, requires an official capacity action or actor, the evidence provides probable cause of such a nexus here.

---

[17] The witnesses depict Azra, and her group, as motivated by a desire to interrogate and a desire to punish, both factors consistent with the CAT torture definition.  *See, e.g.*, DE #1-5 (Statement of Nedjo Blagojevic) at 105("[S]he started slapping him and requesting from him to admit what he had of weapon, to whom he gave the weapon, she told him that he was a Chetnik and that he killed Croat soldiers[.]"); *id.* (Statement of Kuzmanovic) at 73 ("Every day we were taken from that room for interrogation in another room[.]"); *id.* (Statement of Lazic) at 62 ("After they brought us into the premises of the YNA Centre . . . they asked us about weapons, about where the radio transmitter was and what the Serb wanted."); *id.* (Statement of Garic) at 84 (discussing Centre: "they took us into a room in the centre they started asking us where we were from and to show them our documents").

*Particular Defensive Arguments Rejected by the Court*

1.  Basic's argument relative to "civilian" status

The Court rejects Basic's argument concerning "civilian" status.  Basic contends

that the victims may not have been "civilians" and thus would not be covered by the

specific BiH criminal laws at issue.  For several reasons, the Court rejects this argument

as dispositive on the issue of probable cause.

First, the legal argument is inaccurate.  The BiH code section, Art. 173,

categorically proscribes killing or torture in violation of international law and does not

limit its reach to acts against civilians.  Thus, even if Republika Srpska Art. 142 applied

only to civilians, and if the victims here were non-civilian, BiH Art. 173 would remain as

an extradition basis to which the defect would not apply.  Further, as the United States

pointed out in post-hearing briefing, the 1949 Geneva Convention (IV), in terms of

treatment toward civilians, includes within its protection soldiers disarmed and held in

detention.   Geneva Convention (IV) Part I, Art. 3; *see also* DE #80-1 (Memorandum).

Evidence that any victims were soldiers, if it existed, would not eliminate potential

liability under the international law that applies to animate the "war crimes" definitions.

As a factual matter, the Court finds probable cause to believe that the victims

qualify as civilians.  Some victims may have been part of a loose defensive organization

in the Cardak area, which arose in response to local Croat and Muslim military-type

groups.  As to Djuras, Kuzmanovic says he was targeted in part as a perceived "Chetnik

Duke."  DE #1-5 (Statement of Kuzmanovic) at 72.  Zdavko Vidovic identifies himself as

part of a group (including Djuras) that offered "armed resistance" at the time.  DE #1-5

(Statement of Vidovic) at 92.  However, the overall evidence indicates that the Croats

Case: 5:11-mj-05002-REW   Doc #: 87   Filed: 07/27/12   Page: 25 of 41 - Page ID#: 1783

targeted Cardak generally because of the Serbian population there, not because of military conduct originating in Cardak. *See* DE #1-5 (Statement of Lazic) at 63 ("There were threats that Serbs could not live in Derventa, and that they would all be killed or driven away."); *id.* ("I was arrested together with a large number of the population of Serbian nationality on April 25, 1992 . . . ."); *id.* (Statement of Vojnovic) at 119 (referring to a "bigger group of Serbs" taken to the YNA Centre prior to his arrival); *id.* (Statement of Kovacevic) at 68 ("In the middle of April 1992 Croats announced several times that they had an intention to attack the settlement of Cardak."); *id.* (Statement of Kuzmanovic) at 72 ("Croat and Muslim units started attacking the settlement Cardak in the first half of April because the majority of population there was of Serbian nationality."). That those targeted Serbs organized to defend does not, under any law presented, categorically convert them from civilians to military.

Indeed, the Croats arguably dressed some of the prisoners in uniform to buttress an appearance of non-civilian activity.[18] Authorities discovered Djuras's body dressed in military trousers and later referred to him as a "soldier." This creates a question as to his role, but Art. 173 would warrant extradition regardless of that status, and the 1949 Geneva Convention (IV) scope strongly indicates that Djuras's (and the other detainees') status, once detained, would be civilian for purposes of war crime analysis under Art. 142.

---

[18] *See* DE #1-5 (Statement of Kuzmanovic) at 73 ("The next day, in the morning, other people from Cardak from the other room and I were forced to wear military uniforms although we were wearing civilian clothes while we were in our houses in Cardak, and they took photos of us in uniform."); *id.* (Statement of Garic) at 84 ("[T]hey gave us the uniforms of former Yugoslav Army grey olive in colour and after that the photo reporters came and they took photos of us wearing those uniforms, telling us we were Chetniks.").

    2.  <u>Other defensive arguments relative to probable cause</u>

Basic raises various other arguments from the record in an attempt to undercut probable cause. She cites questions about the referenced Croatian military unit compared to her actual service. She raises issues over inconsistent names in the record. Each argument is relevant and would especially matter in an ultimate merits determination. Here, the standard is probable cause. The issues do not thwart a probable cause finding.

Basic was in the Croatian military at the relevant time. The official Croatian records place her within units different from those identified numerically by the Serbian witnesses. *See, e.g.,* DE #1-7 at 18 (Croatia identifying Basic as within 305th and 133rd brigades); DE #1-5 (Statement of Kovacevic) at 68 (witness identifying "106th Rijeka brigade"); *id.* at 84 (Statement of Garic) (witness identifying "108th Rijeka brigade"). Despite that, the Court notes that witnesses were unsure about the precise unit and reported inconsistency regarding dress of the Croat soldiers. *See* DE #1-5 (Statement of Lazic) at 63 ("I was arrested by the soldiers of the Rijeka brigade, who were wearing the uniforms of the Croatian Army and with their signs, and the way those people looked was unusual. They had half of their heads shaved and by their clothes they differed from the other uniformed units."). Further, even the Croat military's correspondence is questionable, reporting Basic as not being involved in active hostilities *and* as being in line for an award related to war-time service. *See* DE #1-7 at 16 (March 2010 letter simultaneously reporting no record of her service in "Fatherland War" but also noting "proposal for awarding the Memorial of the Fatherland War for this person"). This creates little confidence in the Croatian records as conclusive. The witnesses invariably characterize Azra as a Croat soldier from Rijeka, and Rijeka is Basic's hometown. *See*

*id.* at 7 (copy of Personal Identification Card identifying Rijeka as place of birth); *id.* at 12 (Marriage Certificate stating same); *id.* at 14 (Certificate of Nationality stating same). Without question, Basic was in the Croatian military at the time. The inconsistency in unit designation is a defensive area but ultimately not a bar to probable cause.

Several witnesses identify Azra as "Azra Kovacevic," which the United States reports as an alias of Basic. *See* DE #1-5 (Statement of Djuro Zivanic) at 115 (referring to "Azra Kovacevic"); *id.* (Statement of Vojnovic) at 119 (referring to "Azra Kovacevic"); *id.* (Statement of Jovic) at 87 (referring to "Azra Kovacevic" and a "certain Azra"); *id.* at (Statement of Vidovic) 92 (referring to "some Azra from Rijeka"). This may or may not be so. The witnesses using "Kovacevic" are discussing events of the same date and location, but the record does not disclose a connection between that last name and Basic. This creates a weight question with some impact on the likely culpability of Azra Basic (as opposed to a different Azra). It also is possible that witnesses simply picked up the wrong name for the right person.[19] That topic, and Basic's arguments relative thereto, ultimately must await a merits resolution.

## V.     Other Procedural Issues Regarding Extradition

### A.     *BiH's extradition request meets the Treaty's timeliness requirement. The applicable statutes of limitations do not bar extradition.*

A particular requirement of the Treaty concerns timeliness of prosecution. Article VII provides:

> Extradition shall not be granted, in pursuance of the provisions of this Treaty, if legal proceedings . . . for the act committed has become barred

---

[19] For instance, Jovic swore he was at the YNA Centre with Kovacevic, Garic, Blagojevic, Kuzmanovic, and Stajcic and, yet, he uses a different name (Azra Kovacevic). This fairly suggests a mistake in nomenclature but not a misidentification. DE #1-5 (Statement of Jovic) at 87.

by limitation, according to the laws of the country to which the requisition
is addressed.

Treaty, Art. VII. The Court resolved, in part, application of this section in its prior
decision regarding Basic's motion to dismiss. *See* DE #63 (Opinion and Order) at 10-13.
The Court must determine whether a prosecution here would be timely for the torture
alleged to have occurred in BiH. The analysis applies the most analogous domestic crime
under federal law. *See id.* at 11 (discussing cases).

The Court persists in its view that, under any construction, the murder claim
would be timely. There is no federal statute of limitations for the capital crime of
intentional murder, as the Court determined in its prior decision. *See id.* at 11-12. Legal
proceedings would be timely under American law for that act allegedly committed in
BiH.

The torture analysis is more complicated. The Court does find the matter timely,
as to 2 of the 3 victims, but not for the reasons principally advocated by the United
States.

The United States attempts to rely on the statute of limitations that would apply,
under some circumstances, to the federal torture statute. 18 U.S.C. § 3286 creates an
eight year limitation period for, among other things, a violation of 18 U.S.C. § 2340A.
However, for torture (and other federal crimes of terrorism) creating a "risk of death or
serious bodily injury to another person" there is no limitation period. 18 U.S.C. §
3286(b) (cross-referencing 18 U.S.C. § 2332b(g)(5)(B), which includes as a "federal
crime of terrorism" prosecution under the torture statute, 18 U.S.C. § 2340A). Per the
United States's construction, the acts directed toward Kuzmanovic, Jovanovic, and Maric
would qualify, sparing any prosecution of Basic from a limitations bar.

28

The Court does not doubt the qualifying gravity of the alleged conduct but will not apply § 3286. The specific torture statute did not become effective until April 1994, two years after the Derventa events. In the United States, there could be no valid legal proceedings against Basic under a substantive statute that post-dates the alleged torture.[20] *See Collins v. Youngblood*, 110 S. Ct. 2715, 2718-19 (1990) (applying *ex post facto* bar to "penal statutes which disadvantage the offender affected by them," and stating: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."). If there could be no legitimate prosecution under § 2340A, under *ex post facto* principles, it would make no sense to analyze timeliness premised on that (inapplicable) statute.

Rather, any torture prosecution, irrespective of substantive basis, would fall under the general non-capital limitations period of 18 U.S.C. § 3282(a). That catch-all bars prosecution "for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." *Id.* § 3282(a). In this case, that section creates a bar date of approximately April 26, 1997.

While charge initiation under federal law requires an indictment or information, the BiH system plainly does not align with American procedure; the jurisdiction-to-

---

[20] The United States argues that *ex post facto* analysis does not apply in the extradition context. The Court agrees that the procedures for and laws relating to extradition generally apply at the time of extradition. *See In re Extradition of Ernst*, 1998 WL 395267, No. 97 Crim. Misc. 1, pg. 22 (S.D.N.Y. July 14, 1998) (noting "more than 100 years of precedent . . . that extradition treaties are not subject to the constitutional prohibition against *ex post facto* laws"). The Treaty requires, however, a substantive analysis of timeliness of prosecution. Assessing that matter requires a hypothetical prosecution, on American soil, of the 1992 conduct. That exercise thus demands good faith consideration of what laws might legitimately apply.

jurisdiction translation calls for some analytical gymnastics. The question becomes whether BiH took an act to formally initiate prosecution, such that the Court can find tolling to have occurred during the limitations period. "In the context of an extradition proceeding where a step is taken in a foreign legal system to toll the statute of limitations that step also tolls the limitations period under United States law." *Cherry v. Reish*, 1996 WL 509735, No. 96-CIV-1679 (S.D.N.Y. Sept. 9, 1996) (citing *Caplan v. Vokes*, 649 F.2d 1336, 1340-41 (9th Cir. 1981)).

Indeed, the Court is not to probe for a technically corresponding indictment under BiH law. Instead, the Court merely must gauge whether its "functional equivalent," an initiating document, exists. *See Sainez v. Venables*, 588 F.3d 713, 716-17 (9th Cir. 2009) (citing *Restatement (Third) of Foreign Relations Law* and querying whether warrant tolled as "equivalent of a United States indictment"); *id.* (finding tolling "by adhering to our established approach of giving credence to foreign proceedings" based on "respect for other nations' sovereignty and . . . [that] 'the chance of erroneous interpretation is much greater'" when a United States court rules "on the procedural requirements of foreign law" (quoting *Emami v. United States Dist. Ct.*, 834 F.2d 1444, 1449 (9th Cir. 1987)).

Here, BiH issued a formal "Criminal Charge" on January 12, 1993, related to the acts perpetrated against certain named victims at the YNA Centre on April 26, 1992, including Djuras, Kuzmanovic, and Maric. DE #1-5 (Criminal Charge) at 23. The Criminal Charge names "Azra, N.N.," as the perpetrator, and BiH represents that, under its law, it is procedurally valid and permissible to name a defendant where the last name is not yet known to authorities. *See* DE #37-1 (Supplement) at 1. The Charge further

details Azra's gender, military association (108th brigade), and military city of origin (Rijeka).  The Charge specifies that Azra "slaughtered Djuras" on April 26, 1992, and provides detail regarding her alleged disfigurement of Maric and Kuzmanovic at the YNA Centre.

BiH, via its prosecutor's office, reports that there is no statute of limitations for "war crimes" under applicable law.  *Id.*  BiH further reports that, for any statute that otherwise would apply, the Criminal Charge here tolled the limitations period under Bosnian procedures.  *See* DE #39-3 (Supplement) at 3 ("The 1993 'Criminal Charge' naming her as Azra, N.N. is sufficient to identify the defendant fugitive Azra Basic and to toll the statute of limitations under the law of the Republika Srpska and of Bosnia and Herzegovina.  The charge is sufficient without Basic's full name because the Bosnian system permits the submission of a criminal report against "NN" persons and allows for the name to be specified more fully at a later date.").  BiH thus views the Criminal Charge as a sufficient initiating, and thus limitations tolling, document.  The Court accepts as accurate BiH's proclamation of its own procedures.  *See, e.g., In re Extradition of Gang-Choon Han*, No. CV 11-2059-DMG,  2012 WL 33201, at *12 (C.D. Cal. Jan. 6, 2012) (applying *Sainez* and accepting Korean prosecutor's description of Korean charging process and effect of particular document form).

The Court finds the Charge sufficiently equivalent to an indictment or information, for tolling purposes, under federal law.  BiH affirms that the Criminal Charge is a valid charge under its system; just like the warrant in *Sainez*, the Court here will not question what BiH avers about its own system.

Even under United States foundational principles, the Criminal Charge contains sufficient indicia to qualify as valid in the tolling context. The federal rules require an indictment or information, for effectiveness, to provide sufficient particularity, but a name is not a categorical requirement. *See* Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). Such a document is valid, and adequately specific, if it provides information sufficient to identify the person charged, even if the precise name is unknown. *See, e.g., Duffy v. Keville*, 16 F.2d 828, 828 (D. Mass. 1926) ("An indictment must describe the accused sufficiently so that he or she can be identified." (citation omitted)); *United States v. Doe*, 127 F. 982, 983 (N.D. Cal. 1904) (treating as invalid a warrant and indictment naming only "John Doe, a Chinese person" as effectively naming simply **any** Chinese person: "[I]t is not possible to say what particular Chinese person the grand jury intended to indict[.]"); *United States v. Doe*, 401 F. Supp. 63, 65 (D. Wis. 1975) (noting inclusion of one name alias along with race, sex, age, height, weight and other "peculiar facial characteristics" and holding "[A]n indictment which refers to the accused by a fictitious name is not constitutionally impermissible so long as the individual is otherwise adequately identified[.]") (citing *Connor v. Commonwealth*, 296 N.E.2d 172, 175 (Mass. 1973) (requiring not full name but "warrantable inference . . . that the grand jury indicted the defendant"). *See also* Scott Akehurst-Moore, Note, *An Appropriate Balance?—A Survey and Critique of State and Federal DNA Indictment and Tolling Statutes*, 6 J. High Tech. L. 213 n.102 (2006) ("Courts have not created an all-inclusive list but the absence of a name is not fatal so long as the indictment presents sufficient information to identify the person."); Fed. R.

Crim. P. 4(b)(1)(A) (requiring warrant to have name "or, if it is unknown, a name or description by which the defendant can be identified with reasonable certainty").

Here, the Criminal Charge provides enough to meet these standards. It contains Basic's first name, indicating a last name unknown. The Charge provides the target's gender, identifies a particular military association, and identifies the origin source for that unit. *See* DE #1-5 (Criminal Charge) at 23 ("108th Rijeka brigade").[21] Further, the Charge references the target as a "member, or a commander" of the involved brigade. *Id.* This dramatically narrows the field of possible persons to a female, with a particular first name[22], from a particular unit, from a particular town, who may be a "commander" of the group. Further, the Charge provides precise detail as to the events and location charged, focusing on April 26, 1992, and the YNA Centre allegations. Finally, the Charge incorporates by reference numerous witness statements. Those statements add additional particularity concerning the Azra sought: *Id.* (Stajcic Statement) at 98 ("woman in camouflage uniform with HOS mark"); *id.* (Blagojevic Statement) at 104-05 (same); *id.* (Statement of Vidovic) at 92 (describing act by "Azra from Rijeka"). The Court finds the document sufficiently specific, in context and given the particularization contained, to qualify as charge initiation for tolling purposes.

The Charge does not, however, reference actions toward victim Jovanovic. Thus, any claim against Basic as to that victim did not occur until well after the five-year limitation period and would have expired under this analysis. The United States

---

[21] Whether this ultimately is the *correct* designation is different from whether it is a *sufficiently particular* designation.

[22] The Court finds Basic's evidence/assertions of name commonality not competent.

disavows any relation-back argument, and the Court finds that any proceedings as to Jovanovic would be time-barred.

    1.  <u>Flight does not apply to toll the limitations period.</u>

In this Circuit, the United States faced the burden of proving flight to toll the statute of limitations, under 18 U.S.C. § 3290 and *United States v. Greever*, 134 F.3d 777, 781 (6th Cir. 1998) ("The government was required to prove by a preponderance of the evidence that Greever concealed himself with the intent of avoiding prosecution."). The Government provided no direct evidence as to Basic's intent, relying only on the inference from her 1994 immigration. At the final extradition hearing, the defense presented strong and uncontradicted proof that Basic entered the United States and acted openly, that she has always used the same, accurate identifiers, and that she has made no effort to avoid detection. *See* DE #67 (Hearing Trans.) at 59-65 (Loman testimony on use of name, driver's license, Social Security number); *id.* at 77 (Fultz testimony on open identification and details of living). The employment records tendered show that Basic has not tried to hide who she is or where she lives. *See* DE ##72-1 at 2; 72-5 at 3; 72-2 at 23; 72-7 at 2. (including various Tanbark records: I-9, W-4, and insurance forms, all using name Azra Basic, DOB, and social security number). She entered the United States under her own name. *See* DE #31-3 (Application for Naturalization). Basic did not conceal herself to avoid prosecution, and § 3290 does not apply.

    B.  *BiH Satisfies the Treaty's Warrant Requirement.*

This topic perplexed the Court and resulted in significant briefing, argument, and supplementation by the parties. Ultimately, based on the text of the relevant sources and

the deference due a requesting state in the extradition context, the Court determines that BiH satisfies the Treaty's warrant requirement.

> The Treaty provides the following:
>
> If the person whose extradition is requested . . . is merely charged with a crime, a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued, shall be produced.

Treaty, Art. III.  No document in the BiH packet bears the formal title "warrant of arrest," and Basic seeks to dismiss, in part, on the theory that the United States failed to provide the required warrant.

The Court holds that *Grin v. Shine*, 23 S. Ct. 98 (1902), generally would eliminate the warrant requirement for an extradition pursued under Chapter 209 of the United States Code.  In *Grin*, the Supreme Court addressed various treaty mechanics and found a produced document adequate as a warrant or equivalent document under the specific treaty involved, which had a comparable requirement.  However, the Court also expressly held, as an alternative rejection of the treaty's warrant mandate, that Congress had dispensed with any warrant requirement in the predecessor to § 3184:  "Congress has a perfect right to provide for the extradition of criminals in its own way . . . and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient. . . . This [the warrant of arrest requirement] is one of the requirements of the treaty which Congress has intentionally waived." *Id.* at 102.  The Court read the statute as setting a statutory bar for extradition below that specified in the treaty.  Here, essentially identical treaty and statutory language would seem to eliminate the warrant of arrest requirement.

However, Basic became a naturalized United States citizen in 2007. As the Court previously held in the case, and on the language of the Treaty alone, *Valentine v. United States ex rel. Neidecker*, 57 S. Ct. 100 (1936), would have blocked extradition of a **citizen** for lack of treaty authorization in application of the Treaty. *See* DE #63 (Opinion and Order) at 7-10 (discussing *Valentine*). Congress eventually varied the *Valentine* result by statute, which the Supreme Court invited. As earlier recognized, section 3196 gives authority where *Valentine* noted the power vacuum. *Id.* at 9.

Section 3196 does, though, put a condition on that grant:

> If the applicable treaty . . . does not obligate the United States to extradite its citizens . . . , the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen . . . **if the other requirements of that treaty or convention are met.**

18 U.S.C. § 3196 (emphasis added). Thus, to extradite Basic, the United States must resort to section 3196, and 3196 textually requires that "other requirements of that treaty" be met for the Secretary of State to have power to extradite a citizen. The warrant obligation applies—as a treaty requirement, the Secretary of State cannot extradite citizen Basic unless BiH produces a duly-authenticated warrant copy.

Has BiH done so? Its papers are properly authenticated under § 3190, but has it produced a warrant of arrest? The Court finds that it has.

First, the Court notes again the comity-based deference and liberal construction rules required in the extradition context. As *Grin* advised over a century ago, "These treaties should be faithfully observed, and interpreted with a view to fulfill our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused." *Grin*, 23 S. Ct. at 100; *id.* ("[W]here the proceeding is manifestly taken in

36

good faith, a technical noncompliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations.").

The Second Circuit recently echoed this view when confronting a similar warrant requirement.  *See Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011) (discussing and distinguishing *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009)).  In *Skaftourous*, the court reconfirmed the liberal construction required in this milieu, *id.* at 155, and the requirement that "extradition judges should avoid making determinations regarding foreign law," *id.* at 156 (citation omitted).  The latter principle, founded in comity and judicial "modesty" theories, requires deference to the requesting country's views of its own laws:  "For all of these reasons, U.S. courts are strongly discouraged from reviewing whether the demanding country has complied with its own law and, indeed, it is error to do so except to the limited extent necessary to ensure compliance with the applicable extradition treaty."  *Id.* (citation omitted).  In assessing fulfillment of a like warrant requirement, *Skaftourous* narrowed *Sacirbey* and demanded only a document, properly authenticated, showing "that the fugitive is *currently charged* with an offense recognized by the treaty. It must, in other words, show that the fugitive is in fact 'prosecutable' upon extradition to the demanding country."  *Id.* at 160 (citation omitted).  A valid warrant thus is a document indicating a current local procedural basis for prosecution of a crime within the relevant treaty.   The BiH papers meet this standard under the proper rubric.

BiH relies on two sets of papers as compliant.  On October 19, 2006, BiH authorities entered both an Order and a Decision against Basic.  *See* DE #1-5 (Decision) at 5; *id.* (Order) at  15.  The Decision, issued nominally by a judge, required detention of Basic:  "Pretrial Detention is Pronounced."  *Id.* (Decision) at 5.  The Order, issued by the

same judge, directed issuance of "an international warrant of arrest against the suspect Azra Basic." *Id.* (Order) at 15. That warrant was "to be realized by the competent Ministry of "BiH." *Id.* at 16. The 1996 Order reflects the pending war crimes prosecution against Basic, the perceived reasonable suspicion of guilt, and the suspected flight of Basic. *Id.* (Order) at 15-16.

BiH also cites a July 2007 prosecution document. That letter indicates suspicion that Basic returned to BiH in 2007. Citing the referenced Order and Decision, the prosecutor directs local authorities to look for Basic: "If you find Basic Azra it is necessary to arrest her and bring her [to the prosecutor's office] in accordance with the Decision on order for detention and Order for issuing international arrest warrant." DE #37-2 (Document from Prosecutor's Office) at 3. Per BiH, each of these documents reflects persisting legal authority to arrest Basic, and each is a valid warrant under BiH law. *See* DE #39-3 (Supplemental Information) at 3. That submission notes that the District Prosecutor in Doboj "is the authority that will prosecute," and this is the same office that issued the July 2007 notice. *Id.* The District Court in Doboj authored the two October 2006 papers. Unlike in *Sacirbey*, the authorities on the papers remain viable and empowered.

The Court declines to weigh the extent of BiH's procedural compliance with its own laws. A review of the cited procedural codes reveals provisions that arguably support BiH's claims about what its documents show. *See* DE #74-2 (Authenticated Supplemental Tender) at 1-9 (discussing warrant issuance under Criminal Code of Republika Srpska); *id.* at 1 (referencing Art. 43 of Code and prosecutor power to issue orders directing police to comply with court orders); *id.* at 2 (discussing October 19,

2006, Order as directed to proper body under Art. 446 of BiH Criminal Procedure Code); *id.* at 2 (discussing propriety of order relative to Art. 438 of Criminal Procedure Code of Republika Srpska);  *see also* Republika Srpska Criminal Procedure Code Art. 191 (discussing detention order issued by court); *id.* at 435 (discussing court direction for warrant issuance).  This Court is ill-equipped to parse Bosnian or Republika Srpska practice for fine technical points on the topic of warrant issuance.   The documents do, however, track the authorizing sections and reflect fulfillment of duties as contemplated in the Republika Srpska code.

More fundamentally, however, the documents show that BiH does seek Basic for a live, pending prosecution within its mechanics for jurisdiction and within the Treaty. There is little question but that the collective documents show a decision to prosecute, a decision to detain, and extant orders currently implementing both.  Basic plainly is "prosecutable," to quote *Skaftouros*, under the authenticated papers.

Further, the Court must note that the Treaty's warrant requirement issued in 1902, nearly a century before any of the process here arose.  The record suggests that there is a document somewhere that BiH currently would call a "warrant of arrest," but the form or title of such document now could be quite different from that in existence in 1902.  The point is that excessive focus on nomenclature injects the "savor of technicality" disfavored in the field of treaty analysis.  *See Skaftouros*, 667 F.3d at 160 (noting arguments that "'savor of technicality' are 'peculiarly inappropriate in dealings with a foreign nation'" (citation omitted)).  The common understanding of a "warrant" is a document "directing or authorizing someone to do an act, esp. one directing a law enforcer to make an arrest[.]"  *Black's Law Dictionary* 1616 (8th Ed. 2004).  Here, both

the October 2006 packet (court-issued) and the July 2007 prosecutor notice officially

direct the arrest and detention of Basic.  The Court is puzzled by BiH's particular

practices, but that sovereign can implement the processes and use the titles it pleases. For

present purposes, the United States, on behalf of BiH, has shown documents that suffice

as an authenticated warrant of arrest called for by the Treaty.

## VI.    Certification

For the reasons stated, and as detailed, the Court, per 18 U.S.C. § 3184,

**CERTIFIES** to the Secretary of State that the evidence presented and in the record is

sufficient to sustain the charges presented under the provisions of the Treaty.  The

certification extends to those charges, as reflected in the Amended Complaint, alleging

the murder of Blagoje Djuras and torture of Mile Kuzmanovic and Cedo Maric by Azra

Basic.  The Court further certifies the testimony taken before him as reflected in the

hearing transcript, DE #67.  That hearing, in addition to the Court's official file, which

contains the properly-authenticated tenders, reflects the full basis for decision.[23]  Azra

Basic is extraditable and subject to the further appropriate processes for surrender to BiH

by the Secretary of State.

The Court further warrants and orders the commitment of Azra Basic to the

proper detention facility designated by the United States Marshal or other appropriate

official, and there she shall remain until such surrender, or decision on surrender, shall be

made in accordance with law.

This the 27th day of July, 2012.

---

[23] The Court thus formally **DENIES** the balance of Basic's motion to dismiss (DE #18).

Signed By:

_Robert E. Wier_

United States Magistrate Judge